IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

CARL MALONE                                                    PLAINTIFF

v.                                           CIVIL ACTION NO. 3:22-CV-35-SA-JMV

COOKE INSURANCE CENTER, INC.,
CHRISTY MITCHELL, KELLY GELSTON                              DEFENDANTS


JESSE BARHAM, CHRISTY MITCHELL,
THOMAS A. WOOTEN, KELLY GELSTON,
COOK INSURANCE CENTER, INC.,
BECKY HANNAH                                          COUNTER-PLAINTIFFS

v.

CARL MALONE                                           COUNTER-DEFENDANT

ORDER AND MEMORANDUM OPINION

On February 28, 2022, Carl Malone initiated this *pro se* action by filing his Complaint [1]

against Cooke Insurance Center, Inc.; Christy Mitchell; and Kelly Gelston (collectively "the

Defendants").[1] Malone's Complaint [1] brings a claim of race discrimination under 42 U.S.C. §

1981. On April 14, 2022, the Defendants asserted Counterclaims [9] for defamation, malicious

prosecution, and other state law causes of action. Now before the Court are the parties' cross-

motions for summary judgment concerning only Malone's race discrimination claim. *See* [87, 88].

Having considered the parties' filings, as well as the applicable authorities, the Court is prepared

to rule.

---

[1] Becky Hannah, Jesse Barham, and Thomas Wooten—other employees and the owner of Cooke
Insurance—were initially named as defendants as well. The claims against them were dismissed *with
prejudice* on March 6, 2023. *See* [77].

*Relevant Factual and Procedural Background*

On August 9, 2021, Malone, a Black man, called Cooke Insurance and spoke with Jesse Barham about purchasing a notary bond and error and omissions insurance. Barham initially gave Malone a quote of $100 per year for the notary bond, which was higher than what Malone had previously paid. Malone alleges that he questioned Barham's quote and Barham informed him that he could give him an exact quote if he applied over the phone. After filling out the application over the phone, Barham provided a lower quote of $50 per four years but then informed Malone that he could not finalize the application over the phone. Barham told Malone that he would need to come in to sign and pay for the notary bond, which Malone agreed to do.

The following day, August 10, 2021, Malone went to Cooke Insurance at approximately 4:30 p.m. When he stepped out of his car, Malone adjusted a frozen water bottle that he had tucked into his waistband against his back and underneath his shirt. Malone wore the frozen water bottle to relieve his sciatic nerve pain.

Malone alleges that as he entered Cooke Insurance, commercial insurance agent Christy Mitchell, a White woman, met him at the door and attempted to usher him over to the home and auto department before he could even inform her that he was there for commercial insurance. Malone asserts that he began to explain to Mitchell that he spoke with someone the previous day about a notary bond, but she cut him off and asked him if he had a gun. Confused, Malone responded that he did not have a gun. He alleges that Mitchell "started to get fidgety" and asked again if he had a gun, so he asked to see a manager "to get help so that [he] could get out of there." [87], Ex. 3 at p. 32. Malone alleges that Mitchell then accused him of lying and coming in right before closing time in order to rob them, noting that she saw Malone touching a weapon behind his back before he walked in.

According to the Complaint [1], "[Mitchell] became hysterical and walked swiftly over to go get her co-workers in the next room[.]" [1] at p. 4. Malone alleges that Mitchell returned with two co-workers and all three shouted at him, accusing him of lying and telling him to leave. At his deposition, Malone testified that he felt vulnerable and confused as to why they were asking him if he had a weapon. He therefore took out his phone and began recording.

At this point, Malone realized that they were likely concerned due to the water bottle. He alleges that he again informed them that he did not have a weapon, explained that he was using a frozen water bottle for nerve pain, and then removed the bottle to show them what it was. Malone alleges that he remained inside the business because he intended to purchase insurance and he expected the situation to deescalate, but the Cooke Insurance employees continued to yell at him to leave the property. As he left, he asked for the owner's name and told the Cooke Insurance employees that this was ignorant and that he hoped they learned something from the situation. He contends that he received no apology and that the employees stared out of the window at him to make sure he left.

The Defendants dispute many details of Malone's account of the August 10 interaction. At her deposition, Mitchell testified that when Malone arrived at the office, she was alone on the commercial side of the building, working at her desk where she is unable to see the parking lot. She contends that she did not see Malone before he came in. Rather, she first saw him when he knocked on the door, which she thought was odd because it was unlocked. When she opened the door for Malone, she asked if she could help him, and when he said he needed insurance, she asked whether he needed commercial or home and auto. Malone explained that he had spoken with someone about a bond, and Mitchell directed him to come over to the first desk on the commercial side.

Mitchell alleges that as Malone was explaining that he spoke with someone about a bond the previous day, he was looking around and as he turned, she saw something protruding behind his back. Then, according to Mitchell, she let Malone finish what he was saying, and she told him she would be happy to help him but that she needed to ask him a question first. She then asked Malone what was hidden behind his back and if he had a weapon or a gun.

Mitchell alleges that Malone became aggravated and began moving his hands and looking around. After a pause, Malone said he did not have a weapon and asked why Mitchell would ask that. Mitchell responded that when he moved, she saw something protruding behind his back. At this point, Malone asked for a manager, and Mitchell responded that the manager was not there. Malone then asked for the names of the owners, which Mitchell provided.

Mitchell asserts that she tried to explain why she asked the question, telling Malone that she was a woman there by herself and it was late in the day. According to Mitchell, Malone then said she was accusing him of lying and trying to rob her, which she denied.

According to Mitchell, as this exchange occurred, Malone walked towards her, and she backed up into the hallway that connected the commercial insurance side of the business to the home and auto side. Mitchell explained that she felt uneasy because Malone was becoming increasingly aggravated, "rattling off questions," and not answering the question of what was behind his back. [87], Ex. 1 at p. 47.

Kelly Gelston was working on the home and auto side and came out of her office when she heard Mitchell talking to someone in a flustered voice. Around this time, Malone took out his cellphone and appeared to be recording the interaction.

Gelston and Mitchell allege that they repeatedly apologized to Malone and asked if they could help him. At her deposition, Gelston testified that she told Malone, "I'm sorry Christy

[Mitchell] can't help you. Is there something that I can help you with?" [87], Ex. 2 at p. 19. Both Gelston and Mitchell testified that Malone repeatedly responded that he was offended. Gelston estimated that this went on for three to five minutes. Eventually, Mitchell or Gelston expressed that if Malone felt that way and if they were not going to be able to help him, then maybe it was best for him to leave. They contend that they would have sold him an insurance policy had they been able to diffuse the situation.

As Malone left, he showed Mitchell and Gelston the frozen water bottle and asked them if they felt ignorant. This was allegedly the first time Malone disclosed that the protruding object was a frozen water bottle.

Following the August 10 incident, Malone lodged complaints with the Better Business Bureau ("BBB") and the Mississippi Department of Insurance ("MDI"), alleging that he experienced race discrimination at Cooke Insurance. Malone additionally sent a "Letter of Intent to Sue" to Thomas Wooten, owner of Cooke Insurance. The parties have submitted the letter and the documents relevant to those complaints in support of their Motions [87, 88].

Malone thereafter filed suit in this Court. In his Complaint [1], Malone brings a claim under Section 1981, alleging that he was the denied the right to make and enforce a contract due to his race. Both parties move for summary judgment as to the Section 1981 claim. *See* [87, 88].

*Legal Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

Additionally, on cross-motions for summary judgment, a court examines each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *McGlothin v. State Farm Mut. Ins. Co.*, 925 F.3d 741, 745 (5th Cir. 2019) (citing *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014)).

*Analysis and Discussion*

As noted above, both parties have filed Motions for Summary Judgment [87, 88]. The Court will begin with the Defendant's Motion [87], considering it in the light most favorable to Malone. *See id*.

Before turning to the merits of the Motion [87], the Court will consider the Defendants' argument regarding the alleged spoliation of the video Malone recorded during the interaction at Cooke Insurance. Malone failed to produce the video during discovery, and the Defendants ask the Court to find that he purposefully destroyed the video and apply an adverse inference against him.

## I. Spoliation

"Spoliation of evidence is the destruction or the significant and meaningful alteration of evidence." *Van Winkle v. Rogers*, 82 F.4th 370, 374 (5th Cir. 2023) (citing *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2013)). "Under the spoliation doctrine, a jury may draw an adverse inference that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party." *Id*. (citing *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008)). "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Id*. (citing *Guzman*, 804 F.3d at 713).

First, the Court notes discovery details relevant to the Defendants' spoliation argument. Mitchell, Malone, and Gelston were deposed on October 17, 2022; October 25, 2022; and November 10, 2022, respectively. At Mitchell and Gelston's depositions, Malone, when questioning the witnesses, referred to the fact that he had taken a video. At his deposition, when asked whether the video existed and why he had not disclosed it, Malone stated that he had the video but avoided answering further questions, contending that he had already provided a response. *See* [87], Ex. 3 at p. 57.

The Defendants assert that when Malone alleged he had already responded, he was referring to his written discovery responses that the Defendants had not yet received. Malone's discovery responses are dated November 11, 2022. *See* [87], Ex. 7 at p. 9. Defendants'

Interrogatory Number 8 to Malone stated: "Did you record or otherwise videotape the alleged incident? If so, please produce said recording or video pursuant to Request for Production No. 2. If you content [sic] that you do not currently possess said video, please describe in detail what happened to said video and why you no longer possess it." *Id*. at p. 4. Malone responded as follows: "Plaintiff took a video recording of the incident on August 10, 2021. However, he has been unable to retrieve the video from his phone as at [sic] the date of filing these Responses, and will promptly send the same to Defendants['] attorney as soon as he retrieves the video." *Id*.

Following the depositions and exchange of discovery, Malone did not produce the video. On November 30, 2022, the Defendants filed a Motion to Compel [52] production of the video. The Court denied the Motion to Compel *without prejudice*, as it had been filed after the expiration of the discovery deadline. *See* [59]. However, the Court's Order [59] noted that Malone, in his Response [55] to the Motion [52], admitted that he recorded a video but "now claims that he cannot retrieve the video from his phone, though there is no mention of what the issue is—whether the video file is corrupted, deleted, etc. There is also no accounting of efforts made by Plaintiff to recover the same video file." [59] at p. 1.

On February 28, 2023, after the Court granted their Motion to Extend CMO Deadlines [62], the Defendants filed a Second Motion to Compel [76] production of the video. In their Motion [76], the Defendants again argued that Malone's discovery response was evasive and that if Malone took the video, he should be able to easily retrieve it from his phone or avail himself of multiple avenues of technological assistance to do so. Following a telephonic hearing, the Court entered an Order [83] denying the Motion to Compel [76] and found as follows:

> Upon questioning by the court, Plaintiff reiterated that he is not able to locate or retrieve from his phone the subject video. He represented further that though he undertook to record the events about which he complains in this lawsuit, he has never even seen the video;

observed its presence in his phone; shown it to anyone; or sent it to anyone or anywhere. He has never sought professional help to retrieve any such video but did ask a friend to look at this phone, and said friend was also not able to locate or access the video on the phone.

In light of the foregoing representations to the court, the court will deny the motion to compel as it appears that at all relevant times, Plaintiff has not had, and does not have, the referenced video or access to it. Accordingly, compelling production would be meaningless at this juncture.

[83] at p. 2.

In the present Motion [87], the Defendants contend that Malone had not alleged until the telephonic hearing that he had never seen the video or been able to play it from his phone or any other device.

The Defendants further assert that while Malone represented at the telephonic hearing that he informed the BBB of the video's existence and that he had been unable to retrieve it, the BBB complaint does *not* reference the video. The Defendants allege that the MDI complaint and letter to Wooten also make no mention of the video. The Defendants contend that they only learned about the possible existence of a video after conferring with the individual defendants to prepare a response to the BBB and MDI complaints. In summary, the Defendants contend that Malone did not initially disclose that he recorded a video and when he did, he was evasive about whether he would produce it.

For these reasons, the Defendants ask that the Court find that Malone destroyed the video. In their supporting Memorandum [89], the Defendants argue:

With all due respect, one would expect that any plaintiff who alleged that they suffered such egregious racial discrimination would not only save the video in multiple locations and in multiple formats, but would also avail himself of every available professional to retrieve the video and use it to support his case. Malone did none of these things, and the only logical explanation for his failure to do

these things and for his subsequent representations during the discovery period is that the video supports the Defendants' version of the incident.

[89] at p. 16.

For his part, Malone points out that he disclosed to the BBB in later correspondence that he did not record the incident. In his September 27, 2021 reply to Cooke Insurance's response to the BBB complaint, Malone stated: "For these reasons, I was the one in fear for my life, so much that I pulled out my phone and tried to record the incident. Unfortunately, because I was so nervous, I did not record the incident properly." [93], Ex. 5 at p. 3. Malone further asserts that his exclusion of the video from his initial disclosures demonstrates his honesty regarding the video. And finally, Malone emphasizes that he attempted to obtain CCTV footage after he could not retrieve the video, suggesting that he believed any video evidence would support his version of events.

The Court acknowledges that it is somewhat unusual for a party to initially fail to mention the possible existence of video, at times represent that he has a video but is technologically unable to retrieve it, and at other times represent that he did not record a video at all. However, for an adverse inference to appropriately be applied against Malone, the Defendants must point to evidence that he *in bad faith* destroyed the video. *See Etheridge v. Dolgencorp LLC*, 2023 WL 6882747, at *3 (E.D. La. Oct. 18, 2023) ("[T]he party seeking an adverse-inference instruction must show that the spoliator intentionally destroyed evidence with a culpable state of mind.") (citing *Coastal Bridge Co. v. Heatec, Inc.*, 833 F. App'x 565, 574 (5th Cir. 2020)). The Defendants ask the Court to *infer* that Malone destroyed the video, but there is no evidence before the Court suggesting that Malone *intentionally* did so. Therefore, the Court denies the request for an adverse inference. *See, e.g., Guzman*, 804 F.3d at 713 (Fifth Circuit affirmed denial of adverse inference

instruction where timing of plaintiff's surgery before independent medical examination "seem[ed] strange" but did not suggest he intended to destroy evidence).

II.     Section 1981

Section 1981 bars race discrimination in contracting. The statute provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981(a).

A plaintiff may prove race discrimination through direct or circumstantial evidence. *Powell v. Zurich Am. Ins. Co.*, 653 F. App'x 292, 296 (5th Cir. 2016) (citing *Dunaway v. Cowboys Nightlife, Inc.*, 436 F. App'x 386, 390 (5th Cir. 2011)). "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). For example, in *Jones v. Robinson Prop. Grp., L.P.*, casino employees testified that (1) the manager or his assistant stated that "[they] were not going to hire a black person unless there were extenuating circumstances;" (2) the manager or his assistant stated that "good old white boys don't want blacks touching their cards in their face;" and (3) the manager stated "maybe I've been told not to hire too many blacks in the poker room." 427 F.3d 987, 993 (5th Cir. 2005) *abrogated in part on other grounds by Burlington No. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). The Fifth Circuit held that the employees' testimony was direct evidence of discrimination because it proved, without inference or presumption, that race was used as a factor in employment decisions. *Id.* Additionally, the use of racial epithets undoubtedly demonstrates racial animus and may constitute direct evidence of discrimination. *See Knatt v. Hosp. Serv. Dist. No. 1 of East Baton Rouge Parish*, 327 F. App'x 472, 485 (5th Cir. 2009) (citing *Jones*, 427 F.3d at 993; *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 261 (5th Cir. 2007)).

In his Response Memorandum [93], Malone asserts that "[t]he preceding narration [of the August 10 interaction] is certainly direct evidence of discriminatory intent and a demonstration of racial epithets. It is also a plausible inference of racially discriminatory intent[.]" [93] at p. 9. In other words, Malone seems to contend that his account of the August 10 incident includes both direct and circumstantial evidence of discrimination. The Court emphasizes that neither party has pointed to, nor has the Court located, evidence that the Cooke Insurance employees used racial epithets towards Malone or evidence that *on its face* relates to Malone's race and thus demonstrates discriminatory animus. *See Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994) (direct evidence includes "any statement or written document showing a discriminatory motive on its face"). Therefore, the Court will consider whether Malone has come forward with circumstantial evidence sufficient to support his claim.

The Court evaluates circumstantial evidence claims under the *McDonnell Douglas* burden-shifting framework. *Dunaway*, 436 F. App'x at 390 (citing *Bright v. G.B. Bioscience Inc.*, 305 F. App'x 197, 201 (5th Cir. 2008)). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* (citing *Bright*, 305 F. App'x at 201).

"If the plaintiff establishes a prima facie case of discrimination, the burden then shifts to the [defendant] to produce evidence that its actions were justified by a legitimate, nondiscriminatory reason." *Powell*, 653 F. App'x at 297 (quoting *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002)). "Upon production of such evidence, 'the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the [defendant's] nondiscriminatory explanation is pretextual.'" *Id.* (quoting *Raggs*, 278 F.3d at 468).

A.  *Prima Facie Case*

To establish a prima facie case of discrimination under Section 1981, a plaintiff must establish that "(1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Dunaway*, 436 F. App'x at 390 (citing *Arguello v. Conoco*, 330 F.3d 355, 358 (5th Cir. 2003)). Such activities include the making and enforcement of contracts. *See* 42 U.S.C. § 1981(a)-(b).

The first element is not disputed—Malone is a member of a racial minority. The parties' dispute centers on the second and third elements.

As to the second element, "Plaintiffs can show discrimination in two ways: disparate treatment and disparate impact." *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1013 (5th Cir. 2023) (citing *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006)). "Disparate treatment describes 'actions that treat [a plaintiff] worse than others based on his race, color, religion, sex, or national origin.'" *Id.* (citing *Pacheco*, 448 F.3d at 787). "Disparate impact involves 'practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionally adverse effect on such a protected group.'" *Id.* (citing *Pacheco*, 448 F.3d at 787). Malone's Complaint [1] is best described as alleging disparate treatment. *See* [1] at p. 8 ("Plaintiff avers that he was treated differently by Defendants because he is an African American male.").

Here, the Defendants argue that there is no evidence that they intentionally discriminated against Malone on the basis of his race. They contend that Malone's allegations are "naked assertions," relying only on his own speculation as proof of discrimination. [89] at p. 7-8. According to the Defendants, even assuming that every detail of Malone's account is true, none of his allegations give rise to an inference of discrimination.

A plaintiff's prima facie burden is "not onerous" and "it requires a plaintiff to demonstrate acts that 'if otherwise unexplained are more likely than not based on the consideration of impermissible factors.'" *Powell*, 653 F. App'x at 297 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)); *see also Owens v. Circassia Pharmaceuticals, Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (describing prima facie stage as "'very minimal' barrier"). Here, Malone appears to contend that the Cooke Insurance employees' failure to serve him after he pacified their fears by revealing the water bottle can only be explained by his race.

The parties' arguments pertaining to the intentional discrimination element significantly overlap with their arguments pertaining to pretext. *See Owens*, 33 F.4th at 826 (plaintiff may prove that defendant's explanation is pretext for discrimination through evidence of disparate treatment). Recognizing that the prima facie burden is minimal, the Court finds it appropriate to address these arguments at length at the pretext stage. Thus, for summary judgment purposes, the Court assumes that Malone has established a prima facie case of discrimination.[2]

### B. Legitimate, Nondiscriminatory Reason

The burden now shifts to the Defendants to produce evidence that their actions were justified by a legitimate, nondiscriminatory reason. *See Powell*, 653 F. App'x at 297. The Defendants contend that "Mitchell's initial question to Malone about what was behind his back was asked solely for safety reasons." [89] at p. 10. The Defendants further assert that the question

---

[2] As noted above, the Defendants also dispute whether Malone has satisfied the third prima facie element, i.e., whether the discrimination concerned one of Section 1981's enumerated activities, in this instance, making a contract. Because the Court assumes that Malone has met his minimal prima facie burden, the Court sees no need to resolve the final element of the prima facie case. *See Hager v. Brinker Tex., Inc.*, 2021 WL 1240785, at *4 (S.D. Tex. Mar. 11, 2021) (where court assumed without deciding that plaintiff established prima facie case, it declined to resolve final element) (citing *Randle v. Dragados USA, Inc.*, 2021 WL 40271, at *5 (S.D. Tex. Jan. 5, 2021)).

was not discriminatory because Mitchell would have asked it regardless of Malone's race.

Regarding her reason for asking the question, Mitchell testified as follows at her deposition:

> Q.      Okay. Why did you ask me if I had a gun?
>
> A.      Because you clearly had something hidden behind your back, and I was unaware of what it was. And I was the only person in the office, and I asked it for my safety.
>
> Q.      Okay. What exactly gave you an impression that I might be carrying a gun?
>
> A.      You had something hidden under your shirt that was sticking out of the side of your shirt when you turned around, and I had no clue what it was.
>
> Q.      Okay. But when you asked me, I told you no, correct?
>
> A.      No. You paused, you looked around, you made some gestures, and then you said, no. And then you immediately asked me why would you ask me that question? And I answered the question the same as today: I told you when you turned to the side, I could see there was something tucked underneath your shirt, and I was asking you what it was.
>
> Q.      If I was Caucasian, would you have asked me if I had a gun?
>
> A.      Yes.
>
> Q.      If I was Caucasian, would you have had the impression that I was carrying a gun?
>
> A.      Yes. If I had seen the same thing, no matter who you were, male, female, I would have asked the same question.

[87], Ex. 1 at p. 21-22.

The Defendants assert that Mitchell and Gelston's further actions (which they characterize as attempts to diffuse the situation) were also for safety reasons, as they both testified that they felt uneasy, frightened, or threatened during the conversation with Malone. *See* [87], Ex. 1 at p. 19, 42-43, 51; [87], Ex. 2 at p. 24. These reasons are sufficient for summary judgment purposes.

*C. Pretext*

Lastly, the burden shifts back to Malone to point to "substantial evidence" that the Defendants' asserted reason for their actions is a mere pretext for discrimination. *Owens*, 33 F.4th at 826 (citing *Watkins v. Tregre*, 997 F.3d 275, 283 (5th Cir. 2021)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of impartial judgment might reach different conclusions." *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003)).

Malone may satisfy his burden with evidence of disparate treatment or evidence tending to show that the Defendants' explanation is false or unworthy of credence. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000)). The evidence "must be of sufficient 'nature, extent, and quality' to permit a jury to reasonably infer discrimination." *Id.* (citing *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)). And crucially, the evidence must support the inference that his race was the "but for" cause of the Defendants' alleged refusal to contract with him. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. ---, 140 S. Ct. 1009, 1015, 206 L. Ed. 2d 356 (2020) (a Section 1981 plaintiff must prove that "*but for* race, [he] would not have suffered the loss of a legally protected right") (emphasis added); *see also Abdallah*, 83 F.4th at 1018 ("If discrimination was not a but-for reason, then there is no § 1981 claim."); *Brightergy La., LLC v. GalCan Electric & Gen. Contracting, LLC*, 2021 WL 5236214, at *7 (E.D. La. Apr. 13, 2021) (dismissing for failure to state a claim where Section 1981 plaintiff had not alleged "any basis to support the inference that its race was the 'but for' cause of [defendant's] termination of the subcontract").[3]

---

[3] In his Response Memorandum [93], citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L.Ed.2d 84 (2003), Malone contends that he can establish liability by showing that discrimination was a "motivating factor" in the Defendants' decision. [93] at p. 11. While the "motivating favor" test applies in Title VII cases, and the Title VII analysis is otherwise identical to Section 1981 claims, the Supreme Court

The Court turns first to Malone's arguments suggesting that the Defendants' explanation is unworthy of credence.

### i. False or Unworthy of Credence

Throughout his Response Memorandum [93], Malone repeatedly alleges that the Defendants have provided contradictory statements, lied to the Court, and fabricated evidence. *See* [93] at p. 14-15. First, Malone asserts that the Defendants changed their story after he filed his complaints with MDI and the BBB. Malone points to no evidence to support this assertion. Further, the Court finds no evidence in the record reflecting an initial, contradictory story.

Second, Malone asserts that Wooten, the owner of Cooke Insurance, sent him an apology letter (actually an email, which Malone attached to his Response [93]) only after Malone wrote him a letter detailing his experience at Cooke Insurance. To the extent Malone's assertion is an argument that Wooten changed his story, again, the Court finds no evidence in the record reflecting an initial story that contradicts the Defendants' story. What's more, the email from Wooten in the record does not contain a factual recitation to compare to an initial story. *See* [93], Ex. 3.

With respect to the content of the exchange with Wooten, Malone initially emailed Wooten describing the events of August 10, 2021 and his resultant emotional trauma. *See* [93], Ex. 3 at p. 1-2. Wooten responded that he had met with each employee to determine what happened and that he was "deeply troubled by the things that were mentioned in [the] email, we have never been accused of anything like this in our agency." *Id*. at p. 1. Wooten further stated that he met with community members to determine how to rectify the situation, and they recommended that he sit down with Malone. *Id*. He ended the email with, "I'm sorry this has happened and truly want to

---

made clear in *Comcast* that a Section 1981 plaintiff must establish that race was the "but for" cause of his injury. *Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 325 (5th Cir. 2020) ("Although similar in some respects to Title VII, 42 U.S.C. § 1981 requires plaintiff's showing but-for causation[.]") (citing *Comcast*, 140 S. Ct. at 1015).

talk this out." *Id.* In his communication with the BBB, Malone asserted that the email demonstrated that Wooten "clearly believes his company treated me unfairly." [93], Ex. 5 at p. 3. However, in the complaint lodged with MDI, Malone states that when he met with Wooten, Wooten "showed very little remorse" and "emphasized how Ms. Mitchell had been with the firm for 28 years and never had a previous complaint of this nature." [87], Ex. 5 at p. 3. Perhaps Malone's contention is that Wooten's response was inconsistent in that he was initially remorseful but then failed to show remorse at their subsequent meeting. In any event, Malone has not pointed to evidence that the Defendants provided inconsistent factual accounts.

Next, Malone contends that "Ms. Mitchell's statement that the Plaintiff walked forward to her and she backed up into the middle office so that her co-worker could hear her is false." [93] at p. 15. Malone asserts that this contradicts Gelston's deposition where she testified that Mitchell came to her side of the office to seek help. At her deposition, Gelston testified as follows:

> Q.     . . . [J]ust start from your encounter with – with Mr. Malone, if you would, please.
>
> A.     Yeah. Mr. Malone came in, and he – well, my start of the encounter was Christy [Mitchell] was on our side. I saw that she was flustered, and I got up. And that's when I started speaking to him.
>
> Q.     Okay. And when you – you said you saw that she was flustered?
>
> A.     Yes.
>
> Q.     So – so can you explain in what way was she flustered? Can you explain that in a little more detail?
>
> A.     She was just flustered. I don't really know how else to put it. She – I don't remember exactly the first thing that was said, but I just know there was a conversation being had.
>
>        Christy was talking to someone. At that time, I didn't know who it was. I didn't know if it was a male, female.

18

> I just heard her talking to someone, and she sounded flustered. So I got up to see if I could help.
>
> . . .
>
> Q.    Okay. Did – did Christy come into your office to tell you about me?
>
> A.    No. Like when – when did you mean? Like right when you came in?
>
> Q.    Did Christy – at any point, did Christy come into your office and tell you about me?
>
> A.    No. Christy didn't ask for help. She didn't say anything about you. She just had her back to our side of the office, and she just was talking.
>
>        And, again, I didn't know if you were a guy or a girl. I couldn't hear you. I just heard Christy. So she didn't ask for help.

[89], Ex. 2 at p. 12-15.

Thus, contrary to Malone's assertion, Gelston did not testify that Mitchell came to her office seeking help. Her testimony does not contradict Mitchell's deposition wherein she stated that she backed up to the other office so that her coworkers could hear her.

However, the Court notes that Malone's deposition testimony does contradict Mitchell's. At his deposition, Malone testified that Mitchell "took off to the other room" and came back with her coworkers. [87], Ex. 3 at p. 32. Viewing the evidence in the light most favorable to Malone, the nonmovant, the Court accepts Malone's version of events—that Mitchell specifically went to retrieve Gelston—as true. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

19

In summary, Malone has not pointed to evidence from which a jury could infer that the Defendants' proffered reason is unworthy of credence due to inconsistencies or fabricated evidence. However, because Malone repeatedly refers to the Defendants' version of events as "false," the Court emphasizes that, for purposes of analyzing the present Motion [87], it accepts Malone's versions of events as true. *See id*.

This brings the Court to Malone's evidence of disparate treatment.

### ii.    *Disparate Treatment*

Again, Malone has the burden to prove that the Defendants' proffered explanation is pretextual and that the real reason for their actions was discrimination. *Owens*, 33 F.4th at 826. A plaintiff may prove discrimination through evidence of disparate treatment. *Abdallah*, 83 F.4th at 1013 (citing *Pacheco*, 448 F.3d at 787). "Disparate treatment can be shown by comparing one person's experience to that of a person without the protected trait. But it can also be shown if, but for that person's protected trait, the outcome would have been different." *Id*. at 1014.

Throughout his Response Memorandum [93] and at his deposition, Malone primarily makes two arguments: (1) that Mitchell and Gelston did not feel threatened and (2) that their refusal to serve him after he revealed the water bottle is evidence of discrimination. The Court will walk through Malone's evidence as to each argument in turn.

First, Malone's contention that Mitchell and Gelston did not feel threatened appears to be an argument that their actions were not truly taken for "safety reasons" but were instead motivated by discriminatory animus. In his Response Memorandum [93], Malone asserts:

> [T]he Plaintiff provides evidence through Exhibit A (page 18, lines 7-8) that contradicts Ms. Mitchell's claim of feeling threatened by the Plaintiff due to being the only female present. The Plaintiff explicitly intended to seek help and never uttered any threatening statement towards Ms. Mitchell. Moreover, even when the Plaintiff was accused of carrying a weapon and lying, he attempted to diffuse

20

the situation by requesting the involvement of a manager, as shown in Exhibit A (pages 43-45). Furthermore, Ms. Gelston's deposition (Exhibit A) [sic] confirms that the Plaintiff did not make any threatening movements, and she did not perceive any sense of threat from him.

[93] at p. 11.

In support, Malone points to Mitchell's deposition testimony where he asked, "Did I threaten you in any manner?" and she responded, "Verbally, no." [87], Ex. 1 at p. 18. However, her response to Malone's very next question, as well as other parts of her deposition, demonstrate that she felt threatened:

Q.   Okay. Did I threaten you physically?

A.   Your actions were aggressive and frightened me.

      . . .

Q.   Did you feel threatened when the plaintiff started recording the incident?

A.   Did I feel threatened? By that point, I didn't know what was going on. I was very taken aback, and I just didn't know what I was in the middle of at that point.

Q.   Did you – did you feel threatened?

A.   I was scared, yes.

      . . .

Q.   Okay. Did Mr. Malone at any time threaten you with violence during his visit on August 10th?

A.   Did I feel threatened, yes.

Q.   Did Mr. Malone at any time threaten you with violence during his visit on August 10th? Yes or no?

A.   I felt threatened.

Q.   Okay. Yes? Yes?

> A.    I felt threatened. I don't know – I don't know what [sic] you want me to answer that.

[87], Ex. 1 at p. 19, 51, 60.

Malone similarly contends, without pointing to a specific page, that Gelston's deposition testimony demonstrates that she did not feel threatened. However, Gelston testified as follows:

> Q.    . . . Did I – did I make any threatening motions?
>
> A.    When I was looking –
>
> Q.    Yes.
>
> A.    – no.
>
> Q.    Okay. Did I say anything threatening?
>
> A.    Oh, that's another question.
>
> Q.    Yeah.
>
> A.    Not – it depends on what you mean, "threatening."
>
> Q.    Something that would make you think that I'm going to cause harm to you.
>
> A.    I mean, the situation was definitely escalated.
>
>     . . .
>
> Q.    [D]id I say anything that – anything that would make you think I was going to cause harm to you?
>
> A.    The situation was escalated, and there was no – like we were trying to apologize. We were trying to help you, a—
>
> Q.    So –
>
> A.    – nd there was no –
>
>     . . .
>
> A.    – there was no resolution at the time.

Q.      . . . Did I say anything that made you – that would make you – me – fear – did I say anything that would make you fear me?

A.      Yes. The situation was not decreasing at all.

        . . .

Q.      Okay. At what point did you feel threatened?

A.      When the situation was not decreasing at all. I just –

Q.      Okay.

A.      – felt like it kept escalating, and there was no resolution.

[87], Ex. 2, p. 18-21.

Thus, Mitchell and Gelston both testified that they felt threatened. Additionally, at his deposition, Malone repeatedly confirmed that the women appeared to feel threatened or panicked:

A.      . . . And [Mitchell] took off to other room. . . I was trying to figure out, you know, why she was reacting that way. . . And I told them, I do not have a gun or a weapon. So, you know, at that point, I then figured out, you know, that it was probably this frozen ice bottle. . .

        . . .

Q.      . . . Why not just pull it out and show it to her and say, I don't have a weapon? I have ice on my back.

A.      Because like I said, I had no clue of what she was referring to, you know. The question totally blew me off. You know, you have to understand, I was going in there to simply pay, sign, leave. And so when that started, you know, happening and she started asking me questions, I didn't know. And so about the time I figured it out, she was already gone, you know. She was already gone and she just panicked.

Q.      So you actually witnessed her panic?

A.      Oh, yeah. Oh, yeah.

. . .

Q. Okay. So at any point in time, did Ms. Mitchell or any of the other ladies that were present apologize for the misunderstanding?

A. No. I did not receive one apology. You know, they were in panic mode. So for them, if they think somebody has a gun or weapon – you know, I mean, that's how they reacted. Even after I showed them that I didn't have a weapon, they were still kind of in a frenzy, you know.

Q. Well, let me ask you this: So after they – after you did show them the ice that you had, at that point in time did you still want to do the business and purchase the bond?

A. Yes.

Q. And did you specifically tell them that at that time?

A. Yes. I came there for a service. At no point did I not want to get and leave, you know, without that service. I mean, it's very rudimentary. There's nothing complicated about it. You know, you go to a business. You know, you call them. You make arrangements for the purpose of accomplishing that goal, you know. So, yeah, that's why I didn't leave, you know. That's why I stayed there thinking that the situation was going to calm down, but it never did. It continued to escalate to the point where they continued to tell me to leave, you know. Even at the end.

Q. Okay. Who was it that asked you to leave and what specifically did they say?

A. Well, it was Christy, Crystal, and they were just yelling leave, you know. Leave, you know. You said specifically what did they say?

Q. Did they say, yes.

A. You need to leave. You need to leave, you know. Like I said, kind of in a panic situation, you know.

. . .

24

Q.  So kind of the next logical question. What do you think would have happened that day at Cooke Insurance on August 10, 2021, if you would not have had ice under your shirt, that ice bottle? What do you think would have happened?

A.  You know, like I said, I don't know what would have happened. You know, I don't know. You know, like I said, the threat—what bothers me is once the threat was taken away, I was still denied services. So that's what really, you know, made me go the route that I'm going now, you know. Had it been dropped and service would have been provided, I would not be here. So for me, you know, the threat was eliminated and it was more to it than just the – than just the bottle.

Q.  So you do – you know, by saying that you do acknowledge that at least subjectively Ms. Mitchell did feel a threat of some sort?

. . .

A.  Well, I can't really speak for her. I think that she certainly appeared to feel a threat, but where it was coming from, you know, I can't answer that, you know. Like I said, I think I was targeted, you know. This has never happened to me previously[.]

[87], Ex. 3 at p. 32, 35-38, 58-59.

To recap, Malone realized that the employees' concerns stemmed from the water bottle (though he later states that that he believed there was "more to it" than the bottle and that he could not answer why Mitchell felt threatened). *Id*. at p. 59. He witnessed Mitchell panic. He asserted that they reacted due to their belief that he had a gun, and they remained in a frenzy even after he showed them he did not have a weapon. The situation did not deescalate, and they continuously told him to leave as they were "kind of in a panic situation." *Id*. at p. 38. Therefore, contrary to the argument in his Response Memorandum [93], Malone's own testimony, as well as Mitchell and Gelston's testimony, demonstrates that the Cooke Insurance employees felt threatened. This

directly undercuts his contention that Mitchell and Gelston did not feel threatened and therefore must have acted out of discriminatory animus.

Malone's second argument is that, after he revealed the water battle, Mitchell and Gelston still refused to serve him due to his race. As noted above, Malone testified:

> You know, like I said, the threat—what bothers me is once the threat was taken away, I was still denied services. So that's what really, you know, made me go the route that I'm going now, you know. Had it been dropped and service would have been provided, I would not be here. So for me, you know, the threat was eliminated and *it was more to it than just the – than just the bottle.*

[87], Ex. 3 at p. 59 (emphasis added).

Though not directly stated, Malone appears to contend that he was stereotyped. *See id*. at p. 52 (describing fear of people "stereotyping [him]" and "being weaponized by [his] skin color"). At his deposition, Malone further explained his allegation that Mitchell's actions were attributable to his race:

> Q.     Okay. Do you see where she's coming from being a female in an office late in the day, the only one there, seeing something hidden underneath someone's clothing and from a man and being alarmed as to, you know, what that was? Do you see her position at all as far as her safety goes?
>
> A.     I think she—I'll be honest with you. I think she handled it inappropriately. Had – some of the things would not have occurred, you know, such as her automatically assuming that I'm an auto and home customer and not commercial, you know, kind of just gives me the impression that she doesn't believe that, you know, an African-American can come to Cooke Insurance for a commercial product.
>
>         You know, it started with that and then the fact that, you know, I thought I answered her fears, you know, because she asked me and I told her no. And had I come there to rob her or to attack her, it would have happened. And the fact that I asked her to go get a manager, you know. You don't – you know what I'm saying? I'm asking for help, you know.

> I'm like, if you can't help me, just get somebody else who
> can, you know.
>
> . . .
>
> Q.    . . . You said that – it's your belief that Ms. Mitchell acted
> the way she acted because you were an African-American
> individual; is that right?
>
> A.    I believe I was targeted. Yes, I do.

*Id*. at p. 42-44.

Malone was then asked what evidence he had to support his allegation that Mitchell's

actions were attributable to his race, particularly his allegation that Mitchell would have responded

differently after he revealed the bottle if he were not Black:

> Q.    So I understand that's your belief. I fully understand that,
> and I'm not questioning that.
>
> A.    Okay.
>
> Q.    But my question to you . . . is what proof do you have that
> Ms. Mitchell declined to serve you because of your race?
>
> . . .
>
> A.    Like I said, I think that in normal circumstances she would
> not have – she would not have treated a non-black customer
> in that manner, you know.
>
> Q.    Again, I don't want – I'm not trying to beat a dead horse, but
> that's your belief, right?
>
> A.    Right.
>
> Q.    Other than just your belief – so I'm establishing that you
> believe that. Other than your belief, though, what other
> evidence do you have that you could put before the Court
> that would suggest that Ms. Mitchell or anyone at Cooke
> Insurance did not serve you because of your race?
>
> A.    Like I said, I asked for a manager. Ms. Mitchell had every
> opportunity to, if she was afraid, to go and get a coworker or

to do whatever she needed to do. I know I went through that door and I called the day before and, you know, for a particular service, and at the end of the day I was accused of being there to rob her. At the end of the day, I was also denied service once I made it clear to all that was there that I did not have a weapon. And so that's – that's clearly a violation of my rights.

Q.     Okay. All right. Is there anything else? . . .

A.     That's it. That's enough.

       . . .

Q.     So . . . we talked about the threat that she perceived. And you're aware that her defense is that she felt threatened. Okay? And that she asked you about what was covered by your shirt. Asked you if you had a weapon. You said, No. . .

       What evidence do you have is my question that that incident *at that point* would have been handled any differently or that you would have been treated any differently or that, I guess Ms. Mitchell would have acted any differently had you been a Caucasian person with an ice bottle covered by your shirt as opposed to an African-American?

       MR. MALONE: Objection to form. I've already answered that question.

Q.     (Mr. Lamar) I don't recall you answering that question.

A.     Well, yeah, I did answer that question. You specifically asked me that earlier what evidence and I –

Q.     So you just refer back to your previous testimony?

A.     Right.

*Id*. at p. 44-45, 61-62 (emphasis added).

Malone's testimony demonstrates a genuine belief that the Cooke Insurance employees would have treated him differently if he were not Black. However, he points to no specific *evidence* that ties his race to the treatment he received at Cooke Insurance. Again, "[d]isparate treatment

28

can be shown by comparing one person's experience to that of a person without the protected trait." *Abdallah*, 83 F.4th at 1013 (citing *Pacheco*, 448 F.3d at 787). While Malone contends that a White customer would have been treated differently, Malone has not identified, for example, other Black customers that have received substandard service at Cooke Insurance *or* non-Black customers who received excellent service under similar circumstances. *See, e.g., Dunaway*, 436 F. App'x at 397 (Fifth Circuit reversed grant of summary judgment where plaintiffs presented evidence that appropriately dressed Black nightclub patrons were turned away for dress code violations, while White patrons were not); *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 387 (5th Cir. 2017) (plaintiff minority-owned body shop that had been denied admission to insurer's direct repair program stated plausible claim for discrimination where it alleged that non-minority-owned body shops with inferior qualifications were admitted to program).[4] Nor has Malone offered evidence that the Cooke Insurance employees made statements demonstrating that they were motivated by discriminatory animus. *See Abdallah*, 83 F.4th at 1014 (flight captain caused flight to be canceled after she "was extremely adamant about the two [plaintiffs] not flying because of their names" and after "consistently bringing up what she presumed to be their racial ethnicity as Arabic, Mediterranean[.]") (internal alteration omitted); *Arguello*, 330 F.3d at 358 (store clerk's racially charged comments created question of fact as to intentional discrimination).

---

[4] While Malone has not produced evidence of comparators, the Defendants, for their part, have identified an instance where they allege the Cooke Insurance employees treated a White person similarly to Malone. At her deposition, Mitchell testified that, a few weeks prior to the incident with Malone, the Cooke Insurance employees called the police when a shirtless White woman appeared to be pacing back and forth in front of their building. *See* [87], Ex. 1 at p. 74. Mitchell explained that the woman was "acting like she was hammering something to our door," so they locked the doors and called the police. *Id.* at p. 75. In assessing whether disparate treatment has occurred, the Court considers whether the plaintiff has produced evidence of "similarly situated [comparators]" that experienced different treatment under "nearly identical circumstances." *Morris v. Town of Independence*, 827 F.3d 396, 400-401 (5th Cir. 2016). The Court sees no need to reach the issue of whether the Defendants' proffered comparator was similarly situated to Malone, as the Court has already determined that Malone has offered no evidence of comparators for the Defendants to rebut.

As his testimony demonstrates, Malone's conclusion that he received substandard treatment because of his race is supported only by his own speculation. *See* [87], Ex. 3 at p. 42, 44 (Mitchell immediately directing him to the home and auto department "gives [him] the impression" that she does not believe a Black customer would come in for commercial insurance). A plaintiff's subjective belief and speculation are insufficient to defeat a motion for summary judgment. *Smith v. Albertson's, Inc.*, 251 F.3d 157, 2001 WL 300784, at *2 (5th Cir. 2001) ("Speculation and belief are insufficient to create a fact issue as to pretext.") (citing *Douglas v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc)); *Mandawala v. Northeast Baptist Hosp., Counts 1, 2, and 11*, 16 F.4th 1144, 1151 (5th Cir. 2021) ("Subjective belief alone cannot prove intentional discrimination.") (citation omitted).

Even accepting Malone's account as true, because he has presented no concrete evidence tying the Defendants' actions to his race, he has not presented evidence from which a factfinder may infer that the Cooke Insurance employees would have treated him differently (and sold him an insurance policy) but for his race. *See Owens*, 33 F.4th at 834 (even where employee presented enough evidence to permit a finding that employer's proffered justification for termination was false, summary judgment was not appropriate where she presented no evidence that the true reason for her termination was discrimination). Summary judgment is therefore appropriate as to his race discrimination claim.

*Conclusion*

For the reasons set forth above, the Defendants' Motion for Summary Judgment [87] is GRANTED. Malone's Motion for Summary Judgment [88] is DENIED as moot. Malone's Section 1981 claim is dismissed *with prejudice*. The Defendants' counterclaims remain pending.

SO ORDERED, this the 28th day of March, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE